[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION FOR MODIFICATION (DOCKET ENTRY 150) AND MOTION FOR CONTEMPT (DOCKET ENTRY NO. 148)
The current matter before the court is Rocco J. Frank's Motion to Modify Visitation dated September 14, 2001.[1] Mr. Frank seeks unsupervised visits with his two children, Andrew, born February 6, 1994 and Rachel; born September 17, 1996.
I. PROCEDURAL HISTORY
Custody and parental visitation have been contested issues from the moment the plaintiff father filed his original petition for marriage dissolution. In January, 1998, the parents agreed to refer the issue of visitation to the Bridgeport Superior Court Family Relations Office (hereinafter family relations) for mediation.[2]
The parties were divorced pursuant to a judgment of dissolution issued on August 21, 1998. By understanding of the parties, that judgment granted the defendant sole custody of the two minor children. The agreement also provided that "After six months the issue of visitation will be revisited by the court and a determination will be made concerning further visitation."
Beginning in December 1998 and on a regular basis since that date, the Plaintiff has petitioned this court in his effort to secure unsupervised visitation.[3] In March of 1999, the trial court ordered that family relations complete a full custody and visitation evaluation.[4] At the same time, the parties agreed that the plaintiff would have a psychological evaluation conducted by Harry Adamakos. The parties further arranged to have a telephone placed in Andrew's bedroom in order to facilitate the child's private communication with his father.
On October 19, 2000, in response to one of the plaintiff's many motions for visitation, the court ordered the parties to participate in mediation. While mediation was pending, they both. accepted the following court ordered supervised visitation schedule: Thursday 4:30 p.m. to 6:30 CT Page 1238 p.m., Friday 6:00 p.m. to 7:30 p.m. and Sunday 1:00 p.m. to 4:00 p.m., all at a neutral center. Both parties agreed that the plaintiff's fianceé could participate in some of those visits.
Further litigation and mediation soon followed. See family relations report dated January 18, 2001. By order of the trial court, family relations completed a custody and visitation evaluation. That report, dated July 3, 2001, recommended the initiation of unsupervised visits. To facilitate this change in status, the reporter further recommended that the plaintiff participate in parenting classes as well as post-dissolution counseling that would address the question of communication and co-parenting.
II FACTS OF THE CASE
The parties were heard on two days of trial on the defendant's motion to modify visitation and his motion for contempt.[5] During the hearing, both testified concerning the plaintiff's character and his conduct during supervised visits. A family relations officer familiar with the children and parents testified, and her written report was submitted as a court exhibit. Additionally, supervisors at visitation centers used by the plaintiff testified before the court. The children's guardian ad litem participated in the proceedings. The court had the opportunity to evaluate the evidence and to observe the demeanor of the parties.
The litigation history of this case indicates the acrimony between these parties. Mutual distrust, coupled with a total lack of communication, has led to substantial litigation. The plaintiff does not seek to have custody of his children. At the present time, he simply requests unsupervised visitation with the children so that he can develop a meaningful parent-child relationship. Although the defendant agrees that such a relationship is desirable, she insists that it is not warranted at the present time. Her primary concern appears to be the mental stability of the plaintiff. An auxiliary fear is her belief that the plaintiff will not properly monitor the children's activities.
Visitation, not custody, has always been at issue in this case. As noted in the initial family relations report, there is no question that the defendant is a "devoted, capable mother. Her world revolves around the children's needs and she takes great joy in parenting." The children have thrived in her care. Unfortunately, the defendant is overprotective.
On the other hand, the plaintiff is also a generally acceptable parent. As observed in that same 1998 report, "there is no indication that CT Page 1239 it would not be safe for Andrew and Rachel to spend longer periods of time in their father's care." More recently, he is in a new relationship. He relates well to his fiancée, Terry Finch, and Ms. Finch's own two children, aged seven and sixteen. Both of these children interact well with the plaintiff. His home environment is calm, well-kept and spacious enough for his growing children.
Court orders made it clear that supervised visitation might not continue indefinitely. Initially, family relations envisioned expanded visits, first with the oldest child that would include weekend overnights on a biweekly basis. Unfortunately, the parties' adversarial relationship precluded any potential for an amicable resolution of this issue.
The defendant has some concerns about the plaintiff's mental stability. In August, 1998, in support of a motion to modify child support and alimony payments, the plaintiff himself had raised that very issue. Then the plaintiff claimed "Since the date of the Court's order, Plaintiff has become afflicted with a psychiatric condition which precludes his ability to engage in a meaningful employment if any kind. Plaintiff is under a medical doctor's order to refrain from any work activity." See Motion to Modify Alimony and Child Support dated August, 1998.[6]
The defendant also had some hesitation due to her belief that the plaintiff did not supervise the children at all times during visits several years ago. She has relied on the fact that the plaintiff did at one time leave the children alone in the vicinity of a swimming pool. He also allowed Rachel to play in the snow without proper winter attire. However, there is no evidence that the conduct would be repeated. There is no indication that inattention remains a threat.
Even in the area of supervised visitation, the parties have had some major difficulties. The Sterling Center, site of the initial "neutral" visitation, had to be changed when the defendant acted inappropriately. Her unacceptable conduct significantly postponed the defendant's visits with his children.[7] Later visits occurred at the Children's Center in Fairfield, Connecticut.
Supervisors at the two visitation centers used by these parties both testified that the plaintiff was a loving, appropriate caretaker. Part of the plaintiff's evidence included twenty-six hours of randomly selected tape recordings from the Children's Center. The children approached their father willingly, without fear or hesitation. Their mutual affection was evident.
During the sessions at both centers, the plaintiff presented himself as CT Page 1240 a caring, concerned parent. During the taped sessions, the plaintiff played with the children, read to them and talked with them. He responded to their concerns in a generally acceptable manner. The plaintiff allowed the children to choose their own activities, but participated once the choice was made.
In one session, the children themselves questioned the need for supervised visits, and expressed an interest in going to his home. To his credit, the plaintiff responded appropriately.
The defendant challenged the relevancy of the videotapes, arguing that the plaintiff was aware that the sessions were taped. She cannot point to any inappropriate behavior. She does not suggest that such behavior ever occurred.
The children enjoy their visits with their father. The defendant has, however, attempted to control these interactions. For example, she has insisted that the visits be limited to father and children only, despite the fact that the plaintiff is now in a new relationship. She obviously resents the plaintiff's new companion and her children, even though Andrew and Rachel have no difficulties with these individuals. The defendant has also attempted to direct the activities of the visits, insisting, for example, that the plaintiff feed the children during the short time span rather than allowing the plaintiff to choose his own activities with his children. The court is not persuaded that the children are at risk or are improperly supervised while in the husband's care.
The defendant has many redeeming qualities. She is a loving, caring mother, who enjoys a good relationship with her children. Her children are well nourished, intellectually stimulated and, most importantly, happy. She cares for all of the children's physical, emotional and educational needs and is genuinely interested in their welfare. She strives to protect them from harm.
Unfortunately, the defendant does not trust her former husband. Yet no one who testified could confirm her suspicions. None of the family relations personnel or visitation center supervisors shared her concerns.
The defendant indicted in her testimony that she would not consider unsupervised visits until the children were significantly older. In the court's opinion, the defendant will never agree to allow unsupervised visits.
III RELEVANT CASE LAW CT Page 1241
In considering modification of visitation orders, the court must be guided by the best interest of the children and not the best interest of the parties. General Statutes § 46b-56 (b)(1); Seymour v. Seymour,180 Conn. 705, 709, 433 A.2d 1005 (1980); Connecticut General Statutes Section 46b-56.[8] In order to prevail on a motion to modify custody, the moving party must prove by a preponderance of the evidence that there has been a material change of circumstances which alters the initial order. Alternatively, a court must conclude that the original custody or visitation order was not based upon the best interests of the child. Hallv. Hall, 186 Conn. 118, 122, 439 A.2d 441 (1982). Not all changes in circumstances since the date of the judgment are material. Simons v.Simons, 172 Conn. 341, 344, 374 A.2d 1040 (1977).
"Neither parent's interests with regard to his or her children are a property right. . . . A contest relative to . . . visitation rights, is not one primarily to determine the rights of the respective parties but rather a determination of the best interests of the child or children. . . ." Raymond v. Raymond, 165 Conn. 735, 741,345 A.2d 48 (1974). The best interests of the children will be served if they view both parents as supportive and nurturing. The children should also have the opportunity to develop a meaningful, unrestrained, and normal relationship with both parents.
In the present action, both parents have an obvious love for their children. Both have stable households. With respect to the plaintiff, however, there is one area of concern. The plaintiff has never had significant periods of time alone with his children. Nevertheless, he has complied with all relevant court orders in anticipation of that event.
IV ORDERS
It is in the children's best interest that, during their childhood, they have the opportunity to develop a meaningful, unrestrained, and normal relationship with their father.
Accordingly, in consideration of these findings and the relevant law, the court will enter orders to gradually increase the amount of visitation and to gradually relax the conditions under which it occurs. The court orders as follows:
1. The defendant, Kim Frank, shall maintain sole custody of the minor children. She shall remain designated as the primary residential parent and shall be responsible for the day-today care and upbringing of the minor children. The defendant CT Page 1242 shall discuss matters pertaining to the children's education, religious training, discipline, moral values, medical and dental care, and social, financial and traveling activities with the plaintiff.
2. The plaintiff, Rocco J. Frank Jr., will complete an additional parenting education class.[9]
3. The plaintiff will provide to family relations verification that he no longer requires either therapy or psychological counseling. That verification shall be a notarized statement from his last treating psychologist or psychiatrist. If that individual recommends continued therapy, then the plaintiff shall continue to attend therapy. The court will retain jurisdiction to assure compliance with this provision.
4. The plaintiff shall have unsupervised visitation at his home with both children from 1 to 4 p.m. on Sundays and from 4:30 to 6:30 p.m. on Mondays and Thursdays commencing on April 1, 2002, provided that he has complied with the provisions regarding parenting education and therapy. The plain?tiff shall be available to the defendant by telephone at all times during such visitation and she shall be entitled to call her children once during each such visitation.
5. Beginning on June 1, 2002, the plaintiff shall have expanded unsupervised visitation on alternate Sundays from 10:00 a.m. to 6:00 p.m. The visits are not confined to the plaintiff's home. All other provisions of paragraph 4 remain intact.
6. The plaintiff shall not remove the children from the state of Connecticut at any time for any reason without prior order of the court.
7. Each of the parents will promptly notify the other if either has any knowledge of any illness or accident seriously affecting the health or welfare of the children (defined as requiring the services of a physician). No notice will be necessary of routine medical or dental appointments, nor shall CT Page 1243 the plaintiff be entitled to be present for such appointments. Except in the case of emergencies, the plaintiff shall not seek the services of a physician or dentist for the minor children.
8. Both parents will encourage telephone and mail contact between the children and the other parent, and assist the children in calling and writing to the other.
9. Each parent will employ either an answering machine, fax, beeper or answering service at all times and will respond to inquiries and messages left by the other parent promptly. The minor children are not to be used to convey checks or messages, verbal or written, between the parents. Neither parent will do or say anything to or in the presence of the minor children that would tend to detract from the ordinary love and affection of the minor children for the other parent.
10. Each parent will keep the other informed of the children's school, sports and extracurricular activities and provide the other parent with notice of special events to which parents and/or the public are invited and will provide the other parent with "parent tickets" if distributed or made available for the special event.
11. Each parent is expected to adapt to the changing needs and interests of the minor children, and to arrange his or her schedule to accommodate the minor children's school activities, sport events, birthday party invitations, etc., remembering that such activities are an ordinary part of the children's development and that the minor children will enjoy those activities and benefit from them.
12. Both parents are cautioned that the high degree of animosity between them is detrimental to the minor children and that engaging in ongoing counseling would be of assistance to each of them in resolving disagreements which may arise in the future.
Orders shall enter accordingly. All other orders remain in effect. CT Page 1244
DEWEY, J.